UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

<u>Carla Gericke</u>,
 Plaintiff

 v.           Case No. 11-cv-231-SM
             Opinion No. 2012 DNH 184
<u>Gregory C. Begin; James J. Carney;</u>
<u>Joseph Kelley; Brandon Montplaisir;</u>
<u>Weare Police Department; and</u>
<u>The Town of Weare, New Hampshire</u>,
 Defendants

**O R D E R**

In this civil action, Carla Gericke asserts claims under both the United States Constitution and New Hampshire's common law against the Town of Weare, the Weare Police Department, the department's Chief (Gregory Begin), and three of its officers: Lieutenant James Carney, Sergeant Joseph Kelley, and Sergeant Brandon Montplaisir.  Defendants have moved for summary judgment, asserting that they are entitled to judgment as a matter of law on each of Gericke's claims.  Gericke objects and has filed a cross-motion for summary judgment.[1]

---

[1] After the parties submitted their cross-motions for summary judgment, and following an informal discussion about those pending motions at a pretrial conference, Gericke sought leave to file an amended complaint.  The six claims asserted in the amended complaint, reduced from thirty-two, remain essentially unchanged from her original complaint (with one exception).  The briefing, and supplemental briefing by the parties is adequate to resolve the summary judgment motions as applied to the remaining claims.

For the reasons discussed, defendants' motions for summary judgment (documents no. 19 and 20) are granted in part and denied in part.  Gericke's motion for summary judgment (document no. 21) is denied.

### Standard of Review

When ruling on a motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor."  Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).  Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence."  Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

Nevertheless, if the non-moving party's "evidence is merely colorable, or is not significantly probative," no genuine dispute as to a material fact has been proved, and "summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-

50 (1986) (citations omitted).  The key, then, to defeating a properly supported motion for summary judgment is the non-movant's ability to support his or her claims concerning disputed material facts with <u>evidence</u> that conflicts with that proffered by the moving party.  <u>See generally</u> Fed. R. Civ. P. 56(c).  It naturally follows that while a reviewing court must take into account all properly documented facts, it may ignore a party's bald assertions, unsupported conclusions, and mere speculation. <u>See</u> <u>Serapion v. Martinez</u>, 119 F.3d 982, 987 (1st Cir. 1997).  <u>See also</u> <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

## Background

On March 25, 2010, Carla Gericke was arrested for disobeying a police officer.  She was subsequently charged with that crime, as well as with obstructing government administration, and unlawful interception of oral communications.  Immediately prior to her probable cause hearing in state court, however, those charges were dropped and the case was referred to the Hillsborough County Attorney's office for presentment to a grand

jury.  New charges were never filed and no indictment was
returned.

The record, as currently developed, includes many affidavits
and a substantial volume of deposition testimony describing the
events giving rise to Gericke's civil claims.  Not surprisingly,
the parties do not agree on all of the details surrounding
Gericke's arrest.  Nevertheless, they do agree on most of the
legally relevant facts, which are as follows.

On March 25, 2010, at approximately 11:30 PM, Sergeant
Joseph Kelley of the Weare Police Department observed a car
traveling past him at a high rate of speed.  Using radar
equipment, he determined that the vehicle was traveling at 47 mph
in a 30 mph zone.  He initiated a traffic stop and the vehicle
pulled over to the side of the road, near the Weare Middle
School.  A second vehicle, driven by Gericke, pulled in directly
behind Sergeant Kelley's police cruiser and stopped.  Given the
lateness of the hour, the darkness, and the presence of four
unknown people at the scene (two drivers and two passengers),
Kelley understandably found Gericke's presence to be a
distraction, requiring Kelley to divert his attention from the
vehicle he had stopped.  Traffic stops, particularly those
conducted late at night, pose a risk of danger to police

4

officers, and Gericke's presence at least arguably added to that
potentially dangerous situation.

Sergeant Kelley approached Gericke's vehicle and instructed
her to leave.  Gericke initially resisted, saying she was
traveling with the people whom Kelley had stopped.  She
questioned why he had detained them, and, when Sergeant Kelley
informed her that they had been speeding, she interjected herself
into the situation by questioning the validity of the stop.
Eventually, however, she complied — she moved her car from
directly behind Kelley's cruiser into an adjacent parking area,
where she positioned it parallel to the cruiser, about 30 feet
away.

Sergeant Kelley then turned his attention to the driver of
the other car, Tyler Hanslin.  Kelley reports that Hanslin was
verbally abusive, also questioned the validity of the stop, and
commented that it was "bullshit."  Hanslin then made some unusual
movements with his hands around the area of his belt, and
Sergeant Kelley asked him if he had any weapons.  Hanslin
disclosed that he was carrying a firearm.  Kelley instructed him
to get out of the car, so he could perform a pat-down search.
Hanslin complied, and Kelley removed a Glock 9 mm semi-automatic
handgun from Hanslin's waistband.

Meanwhile, Gericke had exited her car and was standing behind a small fence that separated her from Sergeant Kelley. She yelled to him that she was recording his actions and pointed what Kelley suspected was a camera at him.  And, although Gericke denies it, Kelley says she shouted words encouraging Hanslin not to cooperate.  See, e.g., Affidavit of Sergeant Joseph Kelley (document no. 20-2) at para. 8 ("Ms. Gericke verbally was encouraging Mr. Hanslin not to comply with my motor vehicle stop and shouted 'remember our cause.'").  Gericke later explained that she believed Kelley's decision to stop Hanslin for speeding was "bizarre" and said she saw her own role as that of a witness to the unfolding events, who should document what was transpiring.  Gericke Deposition (document no. 26-4) at 61, 65. Curiously, however, Gericke also testified that she knew her video camera was not working at the time.  Nevertheless, she kept it pointed at Kelley.  Id. at 68.  Sergeant Kelley responded by telling Gericke to return to her car.  She complied, but rolled the window down and "kept the camera trained on him."  Id. at 64.

According to Sergeant Kelley, due to Gericke's continuing involvement, what had begun as a routine traffic stop had, in his view, become a potentially dangerous situation.  He was in the presence of four unknown people (at least one of whom had been carrying a firearm); Hanslin was being less than fully

cooperative; Gericke was shouting at him and protesting the stop;
and it was late at night, and he was alone.  Accordingly, he
called for assistance.  Three members of the Weare Police
Department responded: Lieutenant James Carney, Sergeant Robert
Peterson (not a defendant in this action), and Officer Brandon
Montplaisir.  Around the same time, a third civilian car arrived
at the scene.  The driver, William Rodriguez, exited the vehicle.
The officers were, then, presented with a late night situation
that involved three vehicles, six unknown people, one (known)
firearm, and a number of people outside of their vehicles.

     The responding officers divided their attention among the
three cars.  Lieutenant Carney responded to Rodriguez, Sergeant
Kelley returned his attention to Hanslin, Officer Montplaisir
responded to Gericke, and Sergeant Peterson provided general
assistance to the other officers.  Before Officer Montplaisir
approached Gericke, Sergeant Kelley told him that Gericke had
been interfering with Kelley's ability to conduct the traffic
stop and that she may have a video camera.  Montplaisir
approached Gericke, identified himself as a police officer, and
asked for her license and registration.  Gericke says he was
shouting at her, so she "decided to lock my door and roll my
window up so that I could just talk to him through a crack."
Gericke Deposition at 74.

In response to Officer Montplaisir's request that she produce her driver's license and vehicle registration, Gericke said, "I'm confused.  Is that a lawful order?  I'm not driving the car, I'm parked in a parking lot.  I don't understand why I would have to give you my driver's license - my driver's license and registration."  Id. at 74-75.  Montplaisir explained that, under state law, she was required to produce that information and, for a second time, he asked her to do so.  Again, however, Gericke balked, saying "Are you sure this is a lawful order?  I'm not driving the car, I'm sitting in a parking lot, I don't see why I would have to give you my license and registration."  Id. at 75.  See also Id. at 76 ("So twice I said to him are you - you know, is that a lawful order, why do I have to provide it, I'm not driving the vehicle, I'm parked in a parking lot.").  Officer Montplaisir explained to Gericke that if she did not produce her license and registration, he was going to place her under arrest and, if necessary, officers would use force to remove her from the car.  Montplaisir Deposition (document no. 20-25) at 44-45.

Gericke says she then began to look for her driver's license.  Gericke Deposition at 76.  She claims she "found the State Farm [insurance] card, and I gave that to him through the window, and he threw it back in my face," id. - apparently through the "crack" that she left in the window when she rolled

8

it up.  At that point, Montplaisir decided that he had given
Gericke sufficient opportunity to comply with his (repeated)
requests for identification, concluded that she was not going to
comply with that directive, and told her that she was under
arrest for disobeying a police officer.  He instructed Gericke to
get out of her car.  According to Montplaisir, Gericke refused to
exit the vehicle and he again instructed her to do so.  <u>See</u>
Affidavit of Brandon Montplaisir (document no. 20-11) at para.
10.  Eventually, Montplaisir says, Gericke's passenger persuaded
her to comply and Gericke exited the vehicle.  Officer
Montplaisir then placed her under arrest for disobeying a police
officer, handcuffed her, and escorted her to a police cruiser
without incident.  Gericke was transported to the police station,
where she was charged with disobeying a police officer, in
violation of N.H. Rev. Stat. Ann. ("RSA") 265:4.  She was also
charged with obstructing a government official, in violation of
RSA 642:1, and unlawful interception of oral communications, in
violation of RSA 570-A:2, I (also known as New Hampshire's law
against wiretapping and eavesdropping).

     It is not entirely clear from the record how the police came
to possess Gericke's video camera.  <u>See generally</u> Plaintiff's
Memorandum (document no. 26-1) at 4-5.  But, it is undisputed
that they did take it into their possession.  According to

Gericke, after she was processed at the police station, she asked unidentified police officers to provide her with a receipt for the camera.  She claims they refused and she was escorted out of the station.

A criminal probable cause hearing was scheduled for May 25, 2010.  Immediately prior to that hearing, however, the New Hampshire prosecutor for the Town of Weare, Attorney Catherine Baumann, "nolle processed the pending charges, and [she] sent the matter to the Hillsborough County Attorney for presentment to the Hillsborough County Grand Jury."  Affidavit of Catherine Baumann (document no. 20-15) at para. 2.  On November 2, 2010, police obtained a warrant, authorizing them to search the contents of Gericke's video camera - presumably because the video they believed Gericke had taken that night might reveal the extent (if any) to which she obstructed Sergeant Kelley's ability to conduct the traffic stop and, perhaps, the conduct that gave rise to criminal drug possession charges that were filed against Hanslin and his passenger.[2]

---

[2]     Until her civil deposition, Gericke had not revealed to the officers that her video camera was not functioning on the night in question.  So, when officers applied for the search warrant, they reasonably believed the camera contained evidence of criminal conduct.

During the search of the camcorder, digital video files were located, but could not be opened or viewed.  Accordingly, the camera was sent to the New Hampshire State Laboratory.  The lab encountered the same difficulties and it, too, was unable to recover the apparently corrupted video files.  But, it appears that rather than return the camera to the Weare Police Department, the state lab simply retained it - conduct Gericke characterizes as the defendants having "left the camera with the lab."  Plaintiff's memorandum at 6.

In March of 2011, Gericke filed a motion in state court seeking return of her video camera.  That motion was granted and, not long thereafter, Gericke's camera was returned to her by the state.

## Discussion

I.   Gericke's First Amendment Claims.

     A.   Background

Gericke advances two federal constitutional claims in which she asserts that she was the victim of retaliatory prosecution for having engaged in protected First Amendment activities.  See generally 42 U.S.C. § 1983.  In count one, she claims defendants lacked probable cause to charge her with violating New Hampshire's wiretapping and eavesdropping statute, RSA 570-A:2,

but nevertheless pursued that charge in retaliation for her having attempted to videotape Sergeant Kelley performing his official public duties.  See generally Hartman v. Moore, 547 U.S. 250, 256 (2006) ("Official reprisal for protected speech offends the Constitution because it threatens to inhibit exercise of the protected right and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out.") (citation and internal punctuation omitted).  And, she says that because it was clearly established that police officers cannot arrest citizens for merely videotaping them while they perform official duties in a public place, the defendants are not entitled to the protections afforded by qualified immunity.

In count two, she advances a similar claim, asserting that defendants charged her with violating the wiretapping statute in retaliation for having "petitioned the Defendants for a redress of grievances."  Amended Complaint at para. 28.

According to Officer Montplaisir, he arrested Gericke for having disobeyed a lawful order of a police officer - that is, for refusing to produce her driver's license and vehicle registration when instructed to do so.  Police Report of Officer

Montplaisir (document no. 20-12) at 1; Montplaisir Deposition at
45; Montplaisir Affidavit at para. 10. He informed Gericke of
the same when he took her into custody. Subsequently, when she
was processed at the police station, Gericke was charged with
three crimes: the initial crime of disobeying a lawful order of a
police officer, as well as obstructing a government official
during the course of his duties, and violating New Hampshire's
law prohibiting wiretapping and electronic eavesdropping.
Gericke focuses on the wiretapping charge, saying defendants'
decision to charge her for having videotaped the officers
undeniably violated her First Amendment rights.

First, Gericke's <u>arrest</u> for disobeying a police officer was
plainly supported by probable cause and did not violate any of
her constitutional rights. <u>See generally</u> <u>Holder v. Town of
Sandown</u>, 585 F.3d 500, 504 (1st Cir. 2009) (discussing probable
cause to arrest); RSA 594:10, I(a) (discussing the circumstance
under which an officer may make a warrantless arrest for a
misdemeanor violation). <u>See also</u> <u>Atwater v. City of Lago Vista</u>,
532 U.S. 318, 354 (2001) ("If an officer has probable cause to
believe that an individual has committed even a very minor
criminal offense in his presence, he may, without violating the
Fourth Amendment, arrest the offender."). Officer Montplaisir
was entitled, under New Hampshire law, to ask Gericke to produce

her driver's license and/or vehicle registration.  See RSA 265:4, I(e).  See also RSA 263:2 ("[e]very person driving a motor vehicle shall have his driver's license upon his person or in the vehicle in some easily accessible place and shall display the same on demand of and manually surrender the same into the hands of the demanding officer for the inspection thereof.").[3]

The record evidence is undisputed.  Officer Montplaisir twice asked Gericke to produce her license and registration.  On both occasions, she refused to comply and, instead, questioned the lawfulness of his request.  See Gericke Deposition at 31 ("The first two times he asked [for my license] I did not [produce it], because I did not believe it was a legal order because I was not operating the vehicle.").  Only when threatened with arrest and forcible removal from her vehicle, did Gericke give at least the appearance of attempted compliance.  See Gericke Deposition at 76. ("So I actually started looking for my license.  And it was at the time where I had reached over into the cubbyhole and I took out the - the engine book and stuff, and

---

[3]     That Gericke was not actually arrested for having violated RSA 263:2 is not material to the probable cause inquiry.  See, e.g., United States v. Jones, 432 F.3d 34, 41 (1st Cir. 2005) ("As the Supreme Court has recently reiterated, however, the probable cause inquiry is not necessarily based upon the offense actually invoked by the arresting officer but upon whether the facts known at the time of the arrest objectively provided probable cause to arrest.") (citing Devenpeck v. Alford, 543 U.S. 146 (2004)).

I found the State Farm card.").  Officer Montplaisir gave Gericke
sufficient opportunity to comply with his request, and, when she
failed to do so, and offered no plausible excuse for her failure,
he had probable cause to arrest her under state law for
disobeying a lawful order of a police officer.

The critical question presented here is not whether Gericke
was properly placed under arrest - she was - but whether
defendants' subsequent decision to <u>charge</u> her with violating the
wiretapping statute (allegedly in retaliation for having
ostensibly videotaped the officers) violated her First Amendment
freedoms.

B.   Retaliatory Prosecution - Videotaping

In count one of her amended complaint, Gericke asserts that
she "was engaged in lawful First Amendment activities when she
attempted to video - and audio - record Defendant Kelley
performing his public duties in public, and the Defendants
arrested her and charged her with 'wiretapping' in retaliation
for exercising those rights."  Amended Complaint at para. 24.
The Court of Appeals for the First Circuit has recognized that it
is clearly established in this circuit that police officers
cannot, consistently with the Constitution, prosecute citizens
for violating wiretapping laws when they peacefully record a

15

police officer performing his or her official duties in a public area.  Glik v. Cunniffe, 655 F.3d 78, 84 (1st Cir. 2011).

Moreover, in this case, the police lacked probable cause to believe Gericke violated the state law prohibiting wiretapping. Gericke was charged with willfully intercepting, or attempting to intercept, an oral communication, in violation of RSA 570-A:2, I. See, e.g., Weare Police Department Case Submission Form (document no. 21-8).  Importantly, however, that statute provides that, for a crime to occur, the victim of an intercepted oral communication must have had a reasonable expectation "that such communication is not subject to interception under circumstances justifying such expectation."  RSA 570-A:1, II.  See also Fischer v. Hooper 143 N.H. 585, 590 (1999) (providing that the victim of intercepted oral communication must have a "reasonable expectation . . . that her communications will not be intercepted.").  Here, the officers had no reasonable expectation that their public communications during the traffic stop were not subject to interception: they were performing official duties, they were in a public place, and Gericke was openly videotaping (or purporting to videotape) their actions.  See Glik, 655 F.3d at 82-83.

16

Even so, defendants say, the facts underlying this case are at least sufficiently distinct from those presented in <u>Glik</u> that they are at least entitled to qualified immunity.  That is to say, even if they did violate Gericke's constitutional rights, they remain immune from suit and liability.  A government official is entitled to qualified immunity from personal liability if his or her challenged "'conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  <u>Aversa v. United States</u>, 99 F.3d 1200, 1214 (1st Cir. 1996) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  The challenged conduct is measured by a standard of objective reasonableness, that is, one must ask: "Could an objectively reasonable official, situated similarly to the defendant, have believed that his conduct did not violate the plaintiff['s] constitutional rights, in light of clearly established law and the information possessed by the defendant at the time of the allegedly wrongful conduct?"  <u>Wood v. Clemons</u>, 89 F.3d 922, 927 (1st Cir. 1996).  And, as the Court of Appeals for the First Circuit has observed,

> To determine a defendant's eligibility for qualified immunity, courts must define the right asserted by the plaintiff at an appropriate level of generality and ask whether, so characterized, that right was clearly established when the harm-inducing conduct allegedly took place.  This does not mean that a right is clearly established only if there is precedent of considerable factual similarity.  It does mean, however, that the law must have <u>defined the right in a quite specific</u>

17

> <u>manner</u>, and that the announcement of the rule
> establishing the right must have been <u>unambiguous and</u>
> <u>widespread</u>, such that the unlawfulness of particular
> conduct will be apparent ex ante to reasonable public
> officials.

<u>Brady v. Dill</u>, 187 F.3d 104, 115-16 (1st Cir. 1999) (citations
and internal quotation marks omitted) (emphasis supplied).

As suggested in <u>Dill</u>, a defendant does not lose the
protection of qualified immunity if he acts mistakenly, as long
as his mistake was objectively reasonable, since qualified
immunity is intended to protect "all but the plainly incompetent
or those who knowingly violate the law." <u>Malley v. Briggs</u>, 475
U.S. 335, 341 (1986)).

To resolve defendants' claimed entitlement to qualified
immunity, it is necessary to focus on two aspects of the <u>Glik</u>
opinion. First, the court of appeals noted that the "<u>peaceful</u>
<u>recording</u> of an arrest in a public space that <u>does not interfere</u>
with the police officers' performance of their duties is not
reasonably subject to limitation." <u>Glik</u>, 655 F.3d at 84
(emphasis supplied). A reasonable (if not self-evident)
implication of that statement of the law is that the non-peaceful
recording of police officers, in a way that does interfere with
the performance of their duties, is not constitutionally
protected conduct (or, at the very least, it has not been

18

"clearly established" that it is).  Second, the Glik court distinguished a recent decision by the Court of Appeals for the Third Circuit, in which that court held that "there was insufficient case law establishing a right to videotape police officers during a traffic stop to put a reasonably competent officer on 'fair notice' that seizing a camera or arresting an individual for videotaping police during the stop would violate the First Amendment."  Kelly v. Borough of Carlisle, 622 F.3d 248, 262 (3d Cir. 2010) (emphasis supplied).

In light of the foregoing, and given that Glik does not clearly establish a First Amendment right to disruptively and non-peacefully engage in recording the public activity of police officers, a reasonable police officer in this circuit could plausibly conclude that Gericke did not have a constitutionally protected right to videotape the officers during the course of a traffic stop if she was behaving in a way that was not peaceful or was disruptive.[4]

---

[4]     Neither Glik nor Kelly (the Third Circuit opinion) discusses why a police officer might lawfully (and constitutionally) prohibit a person from recording an ongoing traffic stop.  Both courts did suggest, however, that the potentially dangerous nature of traffic stops might prove a meaningful distinction.  Still, in light of the court's broad holding in Glik, a reasonable officer should have known that a blanket prohibition on the recording of all traffic stops, no matter the circumstances, was not constitutionally permissible. In other words, to demonstrate that they are entitled to qualified immunity, defendants must show that Gericke's conduct

The events giving rise to Gericke's claims arose out of a late night traffic stop and the circumstances faced by the officers in this case were substantially different than those faced by the officers in <u>Glik</u>.  Simon Glik used his cell phone to record three Boston police officers arresting a young man on the Boston Common.  Nothing in the opinion suggests that there was anything unusual or dangerous about the circumstances, or that Glik was disruptive in any way.  Here, however, the officers did face a potentially dangerous situation: a late night traffic stop involving multiple vehicles, six citizens (some of whom were quite vocal, even confrontational, in expressing their opposition to the officers), and at least one firearm.  As the court of appeals recognized in <u>Glick</u>, "a traffic stop is worlds apart from an arrest on the Boston Common in the circumstances alleged." <u>Glik</u>, 655 F.3d at 85.  <u>See also</u> <u>Michigan v. Long</u>, 463 U.S. 1032, 1047 (1983) ("[W]e [have] recognized that investigative detentions involving suspects in vehicles are especially fraught with danger to police officers."); <u>Pennsylvania v. Mimms</u>, 434

---

somehow distracted Sergeant Kelley, that it interfered with his ability to perform his official duties, or that it otherwise contributed to the dangerous nature of the late-night traffic stop.  <u>See, e.g.</u>, <u>Glik</u>, 655 F.3d at 84 ("Glik filmed the officers from a comfortable remove and neither spoke to nor molested them in any way . . . Such peaceful recording of an arrest in a public space that does not interfere with the police officers' performance of their duties is not reasonably subject to limitation.") (citation and internal punctuation omitted).

U.S. 106, 110 (1977) (recognizing the "inordinate danger"
confronting police officers conducting traffic stops).

But, with respect to whether Gericke was, in fact,
disruptive, there is a genuine factual dispute that must be
resolved by the trier of fact.  Defendants say Gericke was
disruptive to the point of interfering with the responding
officers' ability to perform their official duties - hence the
decision to charge her with obstruction.  Gericke, on the other
hand, asserts that she was a model of civility and calmness.
See, e.g., Gericke Deposition at 44, 62-65.  Whether the officers
are entitled to qualified immunity depends in large part on
whether Gericke's conduct was within or outside the protection
afforded by the First Amendment - or, more correctly, whether her
conduct was such that a reasonable officer should have known that
she was engaging in protected conduct under the actual
circumstances.  The existence of that genuinely disputed material
fact precludes the court from granting defendants' motion for
summary judgment on grounds of qualified immunity.

C.   Retaliatory Prosecution - Redress of Grievances

In count two of her amended complaint, Gericke alleges that,
without probable cause, defendants charged her with violating the
state wiretapping law in retaliation for her having petitioned

21

the government for redress of grievances. Specifically, she claims she:

> was engaged in lawful First Amendment Activities, in that she petitioned the Defendants for a <u>redress of grievances</u> when she asked that they <u>provide her a receipt for her seized camera</u>. The Defendants arrested her and charged her with "wiretapping" in retaliation for exercising her First Amendment rights.

<u>Id</u>. at para. 28 (emphasis supplied). While there may be some debate as to its precise contours, the right to "redress grievances" is likely not violated when an arrestee unsuccessfully requests a receipt for evidence seized in a criminal case.

Aside from the obvious legal flaws in Gericke's claim, it suffers as well from a fatal factual flaw. According to her original complaint, Gericke was charged with violating the state wiretapping law <u>before</u> she (allegedly) raised the issue of a receipt for her seized camera. <u>See, e.g.</u>, Complaint at para. 18-19 ("Following the arrest, Defendant Montplaisir seized Ms. Gericke's camera, and Defendant Carney instructed Defendant Montplaisir to charge Ms. Gericke with illegal wiretapping under RSA 570-A. . . . <u>Following Ms. Gericke's booking</u>, Ms. Gericke asked for a receipt for her camera.") (emphasis supplied). As a factual matter, then, she plainly was not charged with violating the state wiretapping statute <u>in retaliation</u> for having later

sought a receipt for her camera; on this record, the charge preceded her request.


Defendants are entitled to judgment as a matter of law on count two of the complaint.


II.  <u>Municipal Liability</u>.

In count four of her amended complaint, Gericke asserts that Chief of Police Gregory Begin "failed to properly train and supervise the Defendant Officers by maintaining a policy, custom, or both which caused and/or allowed the Defendants' unlawful unconstitutional conduct to occur thereby causing harm to the Plaintiff."  Amended Complaint, at para. 37.  She advances similar claims against the Weare Police Department (count five) and the Town of Weare (count six).


It is well-established that "[s]upervisory liability under § 1983 cannot be predicated on a respondeat theory, but only on the basis of the supervisor's own acts or omissions."  <u>Aponte Matos v. Toledo-Davila</u>, 135 F.3d 182, 192 (1st Cir. 1998) (citation and internal punctuation omitted).  Consequently, municipalities and their supervisory employees:

> are not vicariously liable under section 1983 for the actions of their non-policymaking employees.  They are responsible only for their own unconstitutional acts.

> Thus, a plaintiff who brings a section 1983 action
> against a municipality bears the burden of showing
> that, through its <u>deliberate</u> conduct, the municipality
> was the "moving force" behind the injury alleged.  Such
> a plaintiff must identify a municipal "policy" or
> "custom" that caused the plaintiff's injury.

<u>Haley v. City of Boston</u>, 657 F.3d 39, 51 (1st Cir. 2011)

(citations and internal punctuation omitted) (emphasis in

original).


In support of her claim against Chief Begin, Gericke alleges

the following:

> The Defendant Officers conducted their actions pursuant
> to Defendant Begin's policies and procedures, the Weare
> Police Department's policies and procedures and the
> Defendant Town's policies and procedures. . . ..
>
> Chief Begin admitted to having the authority to make
> policies and procedures on behalf of the Defendant Town
> and the Defendant PD.  He explained that <u>the policy
> regarding wiretapping</u> is to arrest people for
> audio/video recording his officers without having first
> obtained the consent of the officers and/or if the
> individual is yelling at the officers, moving around
> and using a device that has a red light.

Plaintiff's Memorandum (document 21-2) at 25-26 (emphasis

supplied).  That is not an entirely accurate statement of the

undisputed record evidence.  Chief Begin did not discuss the

police department's "official policy" on dealing with members of

the public who are using videotaping equipment (to the extent the

department even has such a policy).  Rather, he testified about

24

his personal belief that, as long as a citizen is not interfering with an officer's ability to perform his or her official duties, that citizen has a right to videotape the officer.  But, he said he also believes an officer has probable cause to arrest the citizen if he or she is being disruptive or otherwise "interfering with the officer and his duties."  Deposition of Gregory C. Begin (document no. 21-12) at 36.  Gericke points to no other evidence suggesting that the police department had a custom or policy of the sort she alleges.

To the extent Chief Begin's interpretation of the governing law can, standing alone, properly be considered an official governmental policy (a doubtful proposition), it still cannot be said that the "policy" was the "moving force" behind Gericke's alleged constitutional injuries.  She claims that her constitutional rights were violated when, without probable cause, officers charged her with violating the state wiretapping statute, in retaliation for having engaged in protected conduct.  She has pointed to nothing in the record suggesting that any custom or policy enacted or implemented by Chief Begin caused her alleged injuries.  In fact, based upon Gericke's own interpretation of the record evidence, if the Weare Police Department had a policy, it provided that officers should <u>not</u> arrest citizens who are peacefully videotaping officers

performing their public duties.  Chief Begin is, then, entitled
to judgment as a matter of law on count four of plaintiff's
amended complaint.


As to the Town of Weare and the Weare Police Department,
Gericke alleges that:

> [T]he Defendant Town and Defendant PD by and through
> Defendant Begin maintain <u>a policy that requires seized
> property to be returned once a District Court case is
> disposed of</u>.  The Defendant Officers, Defendant PD, and
> Defendant Town failed to follow this policy directive
> by failing to return Ms. Gericke's camera once Attorney
> Baumann had <u>nolle</u> <u>prossed</u> the charges against Ms.
> Gericke.  Finally, Defendant Begin admitted that
> receipts should be given to defendants who have had
> property seized by the Defendant PD.  He also admitted
> that this is especially true if the person asks for a
> receipt.  Here, despite Ms. Gericke asking for a
> receipt, the Defendants did not provide her a receipt
> for her camera.
>
> Therefore, the Defendant Town and Defendant PD <u>clearly
> maintain[] policies and customs which enabled and
> encouraged the Defendant Officers to violate</u> Ms.
> Gericke's constitutionally protected activities.

Plaintiff's Memorandum at 26 (emphasis supplied).


Gericke's conclusion does not follow from her premises.
And, the "policies" she identifies were clearly not the "moving
force" behind her alleged injuries, nor did they "enable" or
"encourage" the defendant police officers to violate her
constitutional rights.  In fact, to the extent policies as

described by Gericke existed, they would have encouraged officers
to return seized (non-contraband) evidence after a criminal case
concludes, and provide receipts for seized evidence upon request.
A lengthy discussion of the point is unnecessary.  The Town of
Weare and the Weare Police Department are entitled to judgment as
a matter of law on counts five and six of plaintiff's amended
complaint.


III. <u>Gericke's State Common Law Claim</u>.

     Finally, Gericke advances a state common law claim for
malicious prosecution (count three), over which she asks the
court to exercise supplemental jurisdiction.  To prevail on such
a claim, Gericke must establish that she "was subjected to a
criminal prosecution instituted by the defendant without probable
cause and with malice, and that the criminal proceeding
terminated in [her] favor."  <u>Stock v. Byers</u>, 120 N.H. 844, 846
(1980) (citation and internal punctuation omitted).  There is no
question that three of those elements are present: Gericke was
charged with violating the state wiretapping law; as discussed
above, defendants lacked probable cause to believe she had
violated that statute; and the proceedings terminated in her
favor when the charges were dropped and not reinstituted.  What
remains unresolved is whether defendants acted with malice.

Under New Hampshire law, malice "is said to exist when the primary purpose in instituting the criminal proceeding was not to bring an offender to justice, but was, on the contrary, ill will, personal hostility, or to obtain a personal advantage." MacRae v. Brant, 108 N.H. 177, 181 (1967) (citations omitted).  But, while malice may be inferred from the lack of probable cause, Welch v. Bergeron, 115 N.H. 179, 183-84 (1975), that inference alone is insufficient to entitle Gericke to judgment as a matter of law.  Defendants vigorously dispute her claim that they acted with any malice toward her; rather, they say they were simply enforcing the law as they understood it.  Whether one or more of the defendants acted with malice toward Gericke is, then, an issue for the jury.  Consequently, neither party is entitled to summary judgment on Gericke's claim for malicious prosecution.

## Conclusion

For the foregoing reasons, defendants are entitled to judgment as a matter of law on counts two, four, five, and six of plaintiff's amended complaint.  Their motions for summary judgment (documents no. 19 and 20) are, therefore, granted in part and denied in part.  Plaintiff's motion for summary judgment (document no. 21) is denied.

28

Because there are genuinely disputed material facts relevant to both count one and count three, those counts cannot be resolved as a matter of law.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

October 15, 2012

cc:  Seth J. Hipple, Esq.
     Stephen T. Martin, Esq.
     Charles P. Bauer, Esq.
     Corey M. Belobrow, Esq.

29